UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

GILBERT M. GOLDMAN, JR.                    CIVIL ACTION

VERSUS                                     NO: 03-0759

HARTFORD LIFE AND ACCIDENT                 SECTION "R" (5)
INSURANCE COMPANY

## ORDER AND REASONS

This is an action for review of the denial of long-term disability benefits under an employee disability benefit plan governed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.*  The parties submitted the case for decision on the briefs and the administrative record.  For the following reasons, the Court FINDS for the PLAINTIFF.

## I.   BACKGROUND

Gilbert Goldman is a former employee of Baroid, a division of the Halliburton Company.  On March 23, 2001, Goldman injured his head, arm and neck while he worked as a mud engineer on an offshore drilling rig.  This action stems from Goldman's attempts

to collect long-term disability benefits as a result of this accident.

### A.   The Plan

Goldman's claims in this case arise under the Halliburton long-term disability insurance plan. (*See* Admin. Rec. at H-1792-H-1832).  Defendant Hartford Life and Accident Insurance Company insures the plan and also makes benefit determinations under the plan. (*See* Admin. Rec. at H-1821 ("The Hartford reserves the right to determine if your proof of loss is satisfactory.")).  An employee is eligible for benefits under the plan if he has a "disability," as that term is defined by the plan.  The plan provides two definitions of disability.  During the 180-day "Elimination Period"[1] and the next two years, a "disability" is an injury or illness that prevents the employee from performing an essential duty of his occupation and causes him to suffer a decline in earnings. (*See* Admin. Rec. at H-1801).  At the end of that time period, the definition of disability changes to mean an injury or illness that prevents the employee from performing an essential duty of *any* occupation for which he is qualified that

---

[1] The Elimination Period is the amount of time for which a covered person must be disabled before benefits are payable. (*See* Admin. Rec. at H-1798, H-1499).

2

provides the potential to make more than 60% of his pre-
disability earnings.  (*See* Admin. Rec. at H-1801).  Benefits
under the plan are equal to 60% of lost income for the first
three years of disability and are reduced to 30% of lost income
thereafter.  (*See* Admin. Rec. at H-1797-H-1798).

To make a claim for benefits under the plan, an employee
must provide Hartford with written notice of disability and proof
of loss establishing the disability.  (*See* Admin. Rec. at H-1820-
H-1821).  If Hartford denies the claim, the plan requires
Hartford to provide the claimant with written notice of the
decision, including the specific reasons for the denial, the
specific policy provisions on which the denial is based, a
description of any additional information necessary for
processing the claim, and an explanation of the claims appeal
procedure.  (*See* Admin. Rec. at H-1821).

Once Hartford denies a claim, the claimant may appeal the
decision for a full and fair review of the claim.  (*See* Admin.
Rec. at H-1822).  The plan provides that appeals will be decided
within 60 days under most circumstances and within 120 days in
all cases.  (*See* Admin. Rec. at H-1822).

**B.   Procedural History**

On February 3, 2003, Goldman sued Hartford in Louisiana

3

state court for long-term disability benefits under the plan.
Hartford removed the action to this Court in March 2003 on the
ground that this Court had jurisdiction over Goldman's claims
under the Employee Retirement Income Security Act, 29 U.S.C. §§
1001, *et seq.*  Around the time that Hartford removed Goldman's
action to this Court, Goldman applied to Hartford for long-term
disability benefits under the plan.  The Court stayed this action
in order to allow the parties to complete the administrative
review process on Goldman's claims.  Hartford ultimately denied
Goldman's claim on the ground that he was not a covered employee
who was eligible for benefits under the plan.

On October 27, 2004, this Court found that Hartford had
abused its discretion in determining that Goldman was not covered
by the plan.  The Court determined that Goldman was, in fact, a
covered employee and remanded the matter to Hartford for a
determination of whether Goldman was entitled to benefits under
the terms of the plan.  (*See* Rec. Doc. 129).

On November 30, 2004, Hartford informed Goldman that it
needed additional information in order to evaluate his reopened
claim for benefits.  (*See* Admin. Rec. at H-1131-H-1134).  On
December 21, 2004 and January 28, 2005, Hartford again requested
additional information from Goldman.  (*See* Admin. Rec. at H-1119-
H-1120, H-1114-H-1115).  On March 10, 2005, Hartford denied

4

Goldman's claim for benefits on the ground that Goldman had failed to provide it with sufficient proof of loss in a timely manner. (*See* Admin. Rec. at H-1107-H-1113). In its March 10, 2005 letter, Hartford provided Goldman with a detailed list of the information that it required from him in order to determine his eligibility for benefits under the plan. (*See* Admin. Rec. at H-1110-H-1112). Hartford also informed Goldman that he had the right to administratively appeal Hartford's decision. (*See* Admin. Rec. at H-1112).

After Hartford denied his claim, Goldman did not appeal administratively, but instead moved in this Court for a judgment determining that Hartford owed him benefits. (*See* Rec. Docs. 131-36). The Court denied Goldman's motion because his first case was closed, and the matter was still before Hartford. (*See* Rec. Doc. 139). Goldman moved for reconsideration of the Court's April 5, 2005 order, and the Court denied his motion. (*See* Rec. Doc. 145). The Court again explained that its October 27, 2004 decision that Goldman was covered under the plan did not establish that he was entitled to benefits under the plan. The Court stated that this action was closed and that Goldman could file a new civil action in this Court if, after exhausting his administrative remedies with Hartford, he remained dissatisfied with Hartford's disposition of his claim. Goldman filed a second

5

motion for reconsideration, which the Court denied. (*See* Rec. Doc. 154). The Court reiterated that the action was closed and warned Goldman's counsel that additional filings of this nature could subject him to sanctions.

Goldman appealed Hartford's decision to deny his claim for benefits by letter dated May 2, 2005. (*See* Admin. Rec. at H-1639). On June 14, 2005, Hartford informed Goldman that it needed additional time to render a decision on his May 2, 2005 appeal and that a decision would be made no later than July 31, 2005. (*See* Admin. Rec. at H-1787-H-1789). On July 20, 2005, Hartford rendered a decision on Goldman's appeal. (*See* Admin. Rec. at H-1639-H-1643, H-1642a). Hartford determined that Goldman was eligible for long-term disability benefits for the period September 20, 2001 (the end of the Elimination Period under the plan) through September 19, 2003. (*See* Admin. Rec. at H-1639). Hartford denied Goldman's claim for benefits after September 19, 2003 because it found that there was insufficient evidence in the record to establish that Goldman qualified as disabled under the plan after September 19, 2003. Hartford pointed to medical evidence indicating that Goldman was capable of performing essentially light duty work, and it listed light duty jobs that, according to Hartford, paid at least 60% of Goldman's pre-disability earnings. (*See* Admin. Rec. at H-1642-H-

6

1643, H-1642a).  Hartford stated that the availability of jobs that Goldman could perform and that would pay at least 60% of his pre-disability income meant that Goldman did not qualify as disabled under the change in definition to the "any occupation" standard after September 19, 2003.  *Id.*  Hartford's July 20, 2005 letter again advised Goldman of his right to appeal its benefits decision administratively.  (*See* Admin. Rec. at H-1643 ("[ERISA] gives you the right to appeal our decision and receive a full and fair review.  You may appeal our decision even if you do not have new information to send us.")).

On July 26, 2005, Goldman appealed Hartford's determination that he was not entitled to benefits after September 19, 2003. (*See* Admin. Rec. at H-1579).  Hartford acknowledged receipt of Goldman's appeal on July 28, 2005 and informed Goldman that it had 45 days in which to decide his appeal, and up to 90 days under special circumstances.  (*See* Admin. Rec. at H-1576).  The parties exchanged a number of letters from late July 2005 through September 2005, but that correspondence related primarily to the amount of benefits to which Goldman was entitled for the period September 20, 2001 through September 19, 2003, not to his July 26, 2005 appeal.  (*See* Admin. Rec. at H-1574-H-1575, H-1587, H-1591, H-1594, H-1596, H-1598-H-1600, H-1619, H-1628-H-1629).  In August 2005, however, the appeal specialist handling Goldman's

7

benefits determination for the 2001-03 period learned from
Halliburton that Goldman's annual salary immediately before his
accident was $97,020.00.  (*See* Admin. Rec. at H-1612).  Although
this information was immediately relevant to the 2001-03 period,
Goldman's pre-disability income was also relevant to the
determination of his eligibility for long-term disability
benefits beyond the initial two-year "closed period" under the
plan.  In particular, Goldman's pre-disability income was
directly relevant to the question of whether there were jobs that
Goldman could perform and that paid at least 60% of his pre-
disability income.  Hartford never informed Goldman that it would
need additional time to process his July 26, 2005 appeal, and
there is no evidence that Hartford ever took any action on that
appeal.

Goldman began this action on September 22, 2005 by filing a
new complaint under the captioned docket number.  (*See* Rec. Doc.
157).  Goldman's new complaint alleges both that Hartford did not
provide him with the full amount of benefits to which he is
entitled for the period September 20, 2001 through September 19,
2003 and that Hartford never made a decision on his July 26, 2005
appeal concerning the denial of benefits after September 19,
2003.  Goldman moved for summary judgment on these claims,
seeking benefits owed from September 20, 2001 through the

8

present, as well as penalties and attorney's fees.  Hartford
moved to strike Goldman's pleadings and to impose sanctions for
violation of the Court's order that Goldman cease filing
pleadings in this case.  Goldman thereafter moved to dismiss his
claim for benefits for the period September 20, 2001 through
September 19, 2003.  The Court granted that motion.  Accordingly,
only Goldman's claim for benefits after September 19, 2003
remains before the Court.

On February 23, 2006, the Court denied Goldman's motion for
summary judgment.  On March 6, 2006, Hartford filed an answer to
Goldman's new complaint and asserted a counterclaim for
attorney's fees and costs under 29 U.S.C. § 1132(g).  On March
30, 2006, the Court denied Goldman's motion for reconsideration
of the Court's order denying summary judgment.  On September 13,
2006, the Court granted the parties' motion to submit the claims
for decision based upon the written record and trial briefs.


**II.  DISCUSSION**

**A.   Standard of Review - ERISA Claims**

Under ERISA, an administrator or fiduciary of a covered plan
must make two general types of determinations in order to
determine whether a claimant is entitled to benefits under the
plan.  *See Schadler v. Anthem Life Ins. Co.*, 147 F.3d 388, 394

(5th Cir. 1998) (citing *Pierre v. Conn. Gen. Life Ins. Co.*, 932
F.2d 1552, 1557 (5th Cir. 1991)).  It must first determine the
facts underlying the claim for benefits.  *Id.* (citing *Pierre*, 932
F.2d at 1562).  The administrator or fiduciary must then
"determine whether those facts constitute a claim to be honored
under the *terms* of the plan." *Id.* (emphasis in original).  If
the administrator or fiduciary denies benefits to the
participant, once the participant has exhausted his
administrative remedies, he can bring a civil action "to recover
benefits due to him under the terms of the plan, to enforce his
rights under the terms of the plan, or to clarify his rights to
future benefits under the terms of the plan."  29 U.S.C. §
1132(a)(1)(B).

Under the standard established in *Firestone Tire & Rubber
Co. v. Bruch*, 489 U.S. 101 (1989), a fiduciary's decisions on
plan terms and eligibility for benefits under the plan are
subject to *de novo* review in the district court "unless the
benefit plan gives the administrator or fiduciary discretionary
authority to determine eligibility for benefits or to construe
the terms of the plan." *Id.* at 115.  If the plan grants such
discretion, the administrator's determinations are reviewed only
for abuse of discretion.  *See Vercher v. Alexander & Alexander
Inc.*, 379 F.3d 222, 226 (5th Cir. 2004).  In the Fifth Circuit, a

fiduciary's factual determinations are always reviewed for abuse of discretion, irrespective of whether the fiduciary is granted discretion under the plan. *See id.* (citing *Pierre*, 932 F.2d at 1562).

As this Court has previously determined, the plan provides Hartford with discretion to interpret the plan and to determine eligibility for benefits. (*See* Rec. Doc. 129, at 14; Admin. Rec. at H-1797 ("Final interpretation of all provisions and coverages will be governed by the Group Insurance Policy on file with The Hartford at its home office."); Admin. Rec. at H-1821 ("The Hartford reserves the right to determine if your proof of loss is satisfactory.")).

Goldman argues that Hartford's benefits determination should be subject to *de novo* review because Halliburton, not Hartford, is named as the Plan Administrator, and it therefore exercises discretion under the plan. (*See* Admin. Rec. at H-1825).  This argument is without merit.  Although it is true that Halliburton is named as the Plan Administrator under the plan, nothing in the plan gives Halliburton any responsibility or discretion to interpret the provisions of the plan or to determine an individual's eligibility for benefits.  Moreover, that Hartford is not itself designated as the Plan Administrator does not establish that it is not vested with discretion under the plan.

11

Under *Bruch*, review under the abuse of discretion standard is not limited exclusively to plan administrators.  Rather, the abuse of discretion standard is appropriately used to review the decisions of any "administrator *or fiduciary*" with "discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Bruch*, 489 U.S. at 115 (emphasis added); *see also* 29 U.S.C. § 1002(21) ("[A] person is a fiduciary with respect to a plan to the extent . . . he has any discretionary authority or discretionary responsibility in the administration of such plan.").  Thus, the focus of the *Bruch* test is not on the formal title of the decision-maker, but instead on whether the plan at issue confers discretion upon the decision-maker for the particular type of decision in question.  Here, the Halliburton long-term disability plan provides in no uncertain terms that Hartford, not Halliburton, is to administer claims for benefits, and, as noted *supra*, the plan confers discretion on Hartford in making those determinations.  Accordingly, Hartford's decisions with respect to a plan participant's eligibility for benefits should ordinarily be reviewed only for abuse of discretion.

Because Hartford both determines eligibility for benefits under the plan and insures the plan, it operates under a potential conflict of interest, because it has a financial stake in the outcome of its benefits determinations.  *See Vega v. Nat'l*

*Life Ins. Servs., Inc.*, 188 F.3d 287, 295 (5th Cir. 1999).  The Court considers the existence of a conflict of interest as a factor in determining whether a fiduciary has abused its discretion.  *Id.* at 295-97.  Courts in the Fifth Circuit apply a "sliding scale" approach to determine the extent to which a conflict of interest need be considered.  *Id.* at 297 ("The greater the evidence of conflict on the part of the administrator, the less deferential our abuse of discretion standard will be.").  Here, Goldman has introduced no evidence on the extent of Hartford's conflict of interest.  As a result, the Court concludes that this conflict would in the ordinary case require that Hartford's decision be granted "only a modicum less deference" than it would otherwise receive under the abuse of discretion standard.  *Id.* at 301.  Because of the peculiar posture of this case, however, this analysis does not end the court's inquiry on the standard of review.

###     C.     Standard of Review - "Deemed Denials"

In its February 23, 2006 order, the Court found that the circumstances of this particular case did not warrant *de novo* review of the denial of benefits despite Hartford's failure to issue a reasoned decision on Goldman's July 26, 2005 appeal.  (R. Doc. 179, pp. 15-40).  That analysis is still relevant and the

Court incorporates it herein.  While that decision was correct based on the arguments before the Court at the time, the Court now finds that Hartford's failure to take into account the evidence it obtained on August 10, 2005 indicating that Goldman's pre-disability income was $97,020.00 casts doubt on the adequacy of the review process under the standard used in *McGarrah v. Hartford Life Ins. Co.*, 234 F.3d 1026, 1031 (8th Cir. 2000).  In *McGarrah*, the Eighth Circuit enunciated a standard that this Court concluded would also apply in the Fifth Circuit.  Under that standard, even a serious procedural irregularity, such as the failure to issue a decision on an appeal, does not reduce the Court's deference to the plan administrator if the irregularity does not undermine the Court's confidence in the decision-making process.  *Id.*  Thus, failure to respond to an appeal did not justify *de novo* review when the administrator previously issued an exhaustively-researched decision, and the claimant presented no credible new evidence with his appeal.  *Id.*

In this case, the Court finds that Hartford's failure to respond to Goldman's July 26, 2005 appeal undermines confidence in Hartford's denial of benefits.  In particular, Hartford invited the July 26, 2005 appeal by advising Goldman of his right to appeal the July 20, 2005 denial of benefits.  (Admin. Rec. at H-1639-H-1643, H-1642a).  Hartford further committed itself to

14

the review process by informing Goldman, on two separate
occasions, of its receipt of his appeal and its intent to address
the appeal administratively.  (Admin. Rec. at H-1576, H-1600).
After inviting and accepting the appeal, Hartford concluded on
August 12, 2005 that Goldman's pre-disability income was
$97,020.00, based on information it obtained from Halliburton.
(Admin. Rec. at H-1598).  Thus, had Hartford issued a reasoned
decision on Goldman's July 26, 2005 appeal, that decision would
have had to incorporate the evidence from Halliburton as to
Goldman's income.  As the Court discusses, *infra*, this evidence
is outcome-determinative.  For these reasons, the failure to
issue a decision on the last appeal casts doubt on the adequacy
of the review process, and the Court finds that Hartford's denial
of benefits should be reviewed on a *de novo* standard instead of a
heightened abuse of discretion standard.

### D.   Analysis

Having concluded that Hartford's decision is not entitled to
deference, the Court has conducted a *de novo* review of the record
reviewed by Hartford in reaching its decision to deny benefits to
Goldman.  Goldman can prevail only if he establishes that he was
entitled to benefits under the plan.  In reviewing Hartford's
decision, the Court is limited to the record that was available

15

to Hartford.  *See Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 639
(5th Cir. 1992).

The Court first reviews Hartford's conclusion that Goldman
is capable of light duty work.  The Court previously reviewed
this decision on an abuse of discretion standard.  (R. Doc. 179
at pp. 41-44).  The Court's decision is not altered by the change
in the standard of review, as the Court concludes that the
evidence establishes that Goldman is capable of light duty work.

First, as the Court noted in its previous opinion, the
administrative record supports the conclusion that Goldman was
capable of light duty work after September 19, 2003.  Hartford
had Goldman's file reviewed by an independent physician, Dr.
Barry Turner, who reviewed Goldman's medical records, including
the notes and recommendations of numerous physicians who had seen
Goldman, MRI scans from both before and after Goldman's May 2001
back surgery, a cervical CT study conducted in February 2002, and
a functional capacity evaluation conducted in June 2002.  (*See*
Admin. Rec. at H-1700-H-1705).  Based on his consideration of
this evidence, Dr. Turner concluded that, in his opinion, after
September 19, 2001, Goldman's "only [employment] restriction
should be no lifting greater than 20 [pounds] occasionally."
(*See* Admin. Rec. at H-1706, H-1642-H-1643; Rec. Doc. 158 Ex. 2).
Dr. Turner noted that his conclusion was consistent with the June

16

2002 assessment of Dr. Kinnard, who also concluded that Goldman was capable of light work.  (*See* Admin. Rec. at H-1642, H-1704).

Second, Goldman argues that Hartford ignored the opinion of one of Goldman's physicians, Dr. John McCain, that Goldman was totally disabled.  In reality, Hartford's independent reviewing physician, Dr. Turner, discussed Goldman's condition with Dr. McCain, and the two doctors agreed that Goldman was capable of "essentially light duty work."  (Admin. Rec. at H-1704-H-1706). Goldman argues that Dr. Turner's conclusion failed to take into account Goldman's visits to a pain management clinic after a 2002 functional capacity evaluation indicating that Goldman was capable of such work.  (Admin. Rec. at H-1705).  Goldman argues that, because the analysis did not take into account the visits to the pain clinic, the doctors' reliance on it is misplaced. Goldman's argument fails because Dr. McCain clearly evaluated Goldman after the visits to the pain management clinic in question and then spoke with Dr. Turner in June 2005.  (Admin. Rec. at H-1708-H-1709).  Thus, Dr. McCain's opinion that Goldman was capable of light duty work *did* take into account relevant events and patient visits that took place after the functional capacity evaluation in question.  Moreover, there is simply not enough evidence to establish that Goldman was incapable of light duty work after September 19, 2003.  In this context, the Court

must rely on the judgments of medical professionals who are capable of interpreting the data and observing the patient directly.  When those judgments are in accord, the Court is loath to substitute its own medical judgment for that of the doctors.

Based on Dr. Turner's review of Goldman's medical records conducted in June 2005, Hartford concluded that the evidence before it established that Goldman was able to perform light work after September 19, 2003.  (*See* Rec. Doc. 158 Ex. 2, at 5).  Reviewing the evidence *de novo*, the Court agrees with Hartford's conclusion.

Further, the analysis does not change as to the Court's conclusion that Hartford has identified a selection of jobs that Goldman is capable of performing.  Goldman urges the Court to disbelieve Hartford's July 2005 employability analysis and credit the November 2002 vocational rehabilitation report completed by Nancy Favaloro.  (Admin. Rec. at H-1719-H-1721, H-0053-H-0058).  The 2005 employability analysis takes into account the relevant medical considerations, Goldman's previous employment history, and Goldman's demonstrated skills.  *Id.*  The Court therefore finds that the 2005 employability analysis report does identify occupations that Goldman was capable of performing.

As to the level of Goldman's income, Hartford's last reasoned decision on Goldman's eligibility came in a letter dated

18

July 20, 2005.  (*See* Admin. Rec. H-1639-H-1643, H-1642a).  In

that letter, Hartford's appeal specialist Daniel Connors wrote as

follows:

> Given that the medical evidence provided support Mr.
> Goldman's ability to perform light work and there are
> light occupations he can perform with potential
> earnings greater than required by the policy, it is
> our determination satisfactory proof of continued
> Disability beyond 9/19/03 has not been provided.
> Therefore, we are terminating his claim effective
> 9/20/03.

(*See* Admin. Rec. H-1642a).  Connors stated that the July 6, 2005

employability analysis report completed by Maggie White

identified several occupations the Goldman could perform and that

generated earnings greater than that required by the policy.  *Id.*

The report listed Goldman's "required earning potential"[2] as

$2,917.44 per month.  (*See* Admin. Rec. H-1719-H-1720).  This

annualizes to $35,009.28, which is 60% of $58,348.80.  Thus,

Hartford based its employability analysis – and its denial of

benefits – on its determination that Goldman's pre-disability

income was about $58,000.00.  The jobs listed in the

employability analysis report had income levels between $3,393.87

---

[2] Under the terms of the plan, this required earning
potential is 60% of the employee's indexed pre-disability
earnings.  (*See* Admin. Rec. H-1801-H-1802).  "Indexed pre-
disability earnings" is defined as the employee's regular monthly
pay on the day before he became disabled, adjusted annually by
the lesser of 10% or the percentage change in the Consumer Price
Index.  (*See* Admin. Rec. H-1802-H-1803).

and $4,759.73 per month, or $40,726.44 to $57,116.76 per year. (*See* Admin. Rec. H-1719).

On August 10, 2005, Daniel Connors received an email from Halliburton's Medical and Disability Administrator Kristi Graham in which Graham clearly indicated that Goldman's pre-disability income had been $97,020.00.  (*See* Admin. Rec. H-1612).  Connors and Graham were communicating for purposes of determining the disability payments Goldman would receive for the 2001-03 period. (*See* Admin. Rec. H-1612-H-1616).  On August 12, 2005, Connors wrote Goldman's attorney, primarily to discuss the 2001-03 period.  Connors stated that "Kristi Graham of Halliburton Company has confirmed Mr. Goldman's annual salary as of 3/14/01 to be $97,020.00 excluding overtime pay, fringe benefits, extra compensation, commissions or bonuses." (*See* Admin. Rec. H-1598-H-1600).  In the final paragraph, Connors wrote that "Mr. Goldman's file has been transferred to Kim Huber for the handling of your 7/26/05 appeal." *Id.*  As discussed above, Hartford never issued a decision on the July 26, 2005 appeal, even though Hartford indicated to Goldman that it was processing his appeal.

There were indications before August 2005 that the income figures used by Hartford were questionable.  First, it is clear that Goldman changed status in January 2001, shortly before the accident.  (Admin. Rec. at H-0574-H-0576).  In fact, Hartford

based its first denial of benefits on Goldman's January 2001 change of status. *Id.* Under the terms of the plan, the income rate upon which benefits determinations are made – both for purposes of eligibility and calculating actual benefits – is the claimant's monthly rate of basic earnings "on October 1 prior to [his] last day as an Active Employee before becoming Disabled." (Admin. Rec. at H-1802). When there has been a change of status, however, the income rate used is "the rate in effect on [the claimant's] last day as an Active Employee before becoming Disabled." *Id.* Despite this provision, it appears from the record that Hartford determined that Goldman's income as of October 2000 was about $58,000.00 and concluded that this was the appropriate number to use. (Admin. Rec. at H-0438, H-0592). Thus, although Hartford was aware of Goldman's change of status, it nevertheless used the October 2000 number, which it should have known was incorrect under the terms of the plan.

Second, Goldman submitted tax forms for the year 2001 that should have suggested to Hartford that its income figure was incorrect. (Admin. Rec. at H-0022). Goldman's income for the year was $28,180.00. *Id.* Goldman worked only through late March, meaning that he worked less than three months. Extrapolating from these three months, one might estimate that Goldman's annual income for that year would be nearly

21

$120,000.00.  Although the tax form does not itemize bonuses and overtime pay, the extreme discrepancy between Goldman's income for 2001 and the number Hartford assigned to his income should have indicated to Hartford that further investigation was necessary.  Instead, Hartford persisted in evaluating Goldman's application for benefits based on a number that it had every reason to believe was not only based on an incorrect interpretation of the policy but also inaccurate.  There is no evidence that Goldman was responsible for these errors, as Hartford indicated on March 27, 2003 that it was awaiting confirmation of Goldman's salary from his employer.  (Admin. Rec. at H-0455).

Given the Court's discussion, Hartford based its July 20, 2005 denial of benefits on an incorrect income level.  Soon thereafter, Hartford learned of Goldman's actual income, and then failed to address his pending appeal.  Strictly speaking, the evidence that was before Hartford when it issued its last reasoned decision does not include the $97,020.00 figure.[3]

---

[3] To the extent that Goldman argues that his income exceeded $97,020.00, the only evidence of this is his 2001 income tax return.  (*See* Admin Rec. H-1063).  The tax return, however, does not indicate clearly what proportion of Goldman's income came from bonuses, overtime, and other income categories that are excluded from the plan definition.  By contrast, the evidence that Goldman's pre-disability income was $97,020.00 per year is clear and uncontroverted by any similarly probative evidence.

Nevertheless, Hartford has made no explanation for its failure to address Goldman's July 26, 2005 appeal; had Hartford decided that appeal, it would have had to take into account the $97,020.00 figure.  In fact, Hartford's own appeal specialist Daniel Connors admitted that Goldman's annual income as of his injury was $97,020.00.  (Admin. Rec. at H-1598).  Under the terms of the plan, the evidence before the Court is therefore that Goldman's pre-disability income was $97,020.00 annually.

Taking into account the higher income figure, the jobs listed in the employability analysis do not offer Goldman an earning potential greater than 60% of his indexed pre-disability benefits.  The highest potential annual income is $57,116.76, which is 60% of $95,194.60.  That amount is less than Goldman's pre-disability income of $97,020.00.[4]  Thus, even accepting Hartford's determination of Goldman's physical capabilities, which the Court did in its February 23, 2006 order, and accepting

_____

[4] The amount is also less than Goldman's indexed pre-disability income, which is $97,020.00 adjusted annually, since March 2001, by the lesser of the Consumer Price Index (CPI-W) or 10%.  In 2001, the change in the CPI-W was about 2.7%.  *See* "Consumer Price Index Home Page," found at http://www.bls.gov/cpi.  In 2002, the change was about 1.4%.  In 2003, the change was about 2.2%.  In 2004, the change was about 2.6%.  Using these figures, the Court calculates a rough estimate of $105,941.94 as Goldman's indexed pre-disability earnings as of 2005, when Hartford completed the employability analysis.  There is no evidence that Hartford took this into account in denying Goldman benefits under the plan.

Hartford's employability analysis, there is no evidence to
support the conclusion that Goldman is capable of performing the
essential functions of any occupation that pays more than 60% of
his indexed pre-disability earnings.  As noted above, the
evidence in the record is that Goldman's pre-disability income
was $97,020.00.  The evidence also establishes that his indexed
pre-disability earnings increase each year by the percentage
change in the Consumer Price Index.  Hartford has identified only
jobs that, in 2005, paid less than 60% of Goldman's pre-
disability income, without any adjustment for the Consumer Price
Index.  Accordingly, the Court finds that Goldman was entitled to
benefits under the plan after the September 19, 2003 change of
definition.[5]

### E.    Attorneys' Fees

Each party has moved for attorneys' fees and costs.  In
determining whether make such an award, a district court should
consider (1) the degree of the opposing parties' culpability or

---

[5] The Court also notes that, although it used a *de novo*
standard of review, the result would not change under an abuse of
discretion standard.  Hartford's failure to decide the last
appeal, which amounted to a denial of benefits, failed to take
into account the lack of evidence that there are jobs that
Goldman can perform that meet his minimum income requirements
under the plan.

bad faith;[6] (2) the ability of the parties to satisfy an award of attorneys' fees; (3) whether an award would deter other persons acting under similar circumstances; (4) whether the parties requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA itself; and (5) the relative merits of the parties' position. *Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1266 (5th Cir. 1980); *see also Lain v. UNUM Life Ins. Co. of Am.*, 279 F.3d 337, 343, 347-48 (5th Cir. 2002) (noting discretionary nature of fee award under ERISA).

The Court does not find that either party is entitled to attorneys' fees or costs.  In analyzing attorneys' fees, the Court cannot overlook the litigation history.  Although Hartford failed to decide Goldman's July 26, 2005 appeal despite obtaining new evidence, Goldman did not argue to the Court that Hartford used the wrong income level until his trial brief.  He did not even argue this in his own summary judgment motion.  Even when Goldman did identify a winning argument, the argument was buried in a brief of which a substantial portion was devoted to claims

---

[6] This prong of the inquiry requires the Court to address the culpability of both parties.  *See Gibbs v. Gibbs*, 210 F.3d 491, 503-04 (5th Cir. 2000) (awarding attorneys' fees to a non-prevailing party based, in part, on the prevailing party's bad faith).

that had been dismissed.  Further, this case has been fraught with unnecessary, immaterial and premature proceedings.  (*See, e.g.*, R. Docs. 19, 94, 113, 125).  On the other hand, it is perplexing why Goldman's salary was such a mystery to Hartford in this case.  Hartford apparently did not investigate how much Goldman was earning until it had denied benefits, despite the fact that Goldman furnished W-2 forms that suggested that the number used by Hartford was in error.  Then, it took Daniel Connors only a few emails to learn Goldman's income level to a virtual certainty.  Although the Court does not find active bad faith, Hartford's handling of this claim has not been exemplary. Nevertheless, the culpability and merits prongs do not support an award of attorneys' fees or costs.

The remaining factors also do not support an award of attorneys' fees or costs.  The ability to satisfy an award of attorneys' fees does not, in itself, justify an award.  This case did not involve a significant legal question, but in fact turned on a frustratingly simple issue.  Finally, although an award of attorneys' fees might deter future benefits providers from taking a cavalier approach to determining a claimant's income level, in the context of the record as a whole, the Court does not find a fee award to be justified.

**IV.   CONCLUSION**

For the foregoing reasons, the Court FINDS for the PLAINTIFF in this case.  The Court further DENIES each party's motion for attorneys' fees and costs.  The parties are ORDERED to submit a judgment consistent with this opinion within 10 days.

New Orleans, Louisiana, this <u>19th</u> day of January, 2007.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE